**James PATTERSON, Petitioner,**

v.

**Frank R. HEADLEY, Superintendent, Arthur Kill Correctional Facility, Respondent.**

No. 98 Civ. 7608 LBS.

United States District Court, S.D. New York.

July 28, 1999.

---

James Patterson, Staten Island, NY, pro se.

**MEMORANDUM AND ORDER**

SAND, District Judge.

James Patterson ("Patterson") petitions this Court *pro se* for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Patterson was convicted after a jury trial in the New York State Supreme Court, New York County, for the criminal sale of a controlled substance in the third degree in violation of New York Penal Law § 220.39. The court sentenced Patterson to a term of imprisonment of five to ten years. On July 2, 1998, the Appellate Division, First Department, unanimously affirmed the conviction. *See People v. Patterson,* 252 A.D.2d 351, 351, 675 N.Y.S.2d 533 (1st Dep't 1998). On August 5, 1998, the New York Court of Appeals denied Patterson leave to appeal. *See People v. Patterson,* 92 N.Y.2d 903, 903, 680 N.Y.S.2d 67, 702 N.E.2d 852 (1998). Petitioner now claims that the trial court violated his Fourteenth and Sixth Amendment rights because the prosecution's evidence was insufficient to prove

his guilt beyond a reasonable doubt. For the reasons set forth below, the Court denies petitioner's application.

## I. Background

### A. The Police Surveillance Plan

James Patterson was arrested on August 9, 1994 for selling a vial of crack cocaine to Lorraine Ray ("Ray"). At trial, the prosecution introduced the testimony of Police Officers Irvin Urbina and David Ruiz, who were assigned to the Street Narcotics Enforcement Unit of the 32d Precinct of the New York Police Department. On the day of Patterson's arrest, Officer Urbina set up and manned an observation post overlooking the southeast corner of Lenox Avenue and 128th Street, while Officer Ruiz, Sergeant Charles, and another officer comprised the field team. The operation occurred between 1:51 p.m. and 3:00 p.m.

### B. Ray's Arrest

Officer Urbina's uncontradicted testimony was that he had an obstructed view of the southeast corner of Lenox Avenue and 128th Street that was aided by clear and sunny weather. (*See* Trial Tr. at 222, 228, 324, 328.) Officer Urbina testified that at 2:15 p.m. he observed Patterson exchange with Ray a dark-topped object for cash. (*See* Trial Tr. at 223, 225.) Officer Urbina testified that Ray was wearing red shorts, a pink t-shirt, and brown sandals. (*See* Trial Tr. 229.) Officer Urbina watched Ray as she departed from Patterson's company. (*See* Trial Tr. at 230–32.) Officer Urbina then described Ray to the field team before she left his field of vision. (*See* Trial Tr. at 229–30.) At that point, Officer Ruiz, Sergeant Charles, and the third officer followed Ray in an unmarked car. (*See* Trial Tr. at 229–30, 264, 321.) They soon apprehended her at 129th Street; according to Officer Urbina, she had not come into contact with anybody during the time she left Patterson's company, nor did she pick up or discard any objects. (*See* Trial Tr. at 231–32, 321.)

Upon apprehending Ray, Officer Ruiz confiscated a red-topped vial that was in her possession, which he later turned over to Sgt. Charles. (*See* Trial Tr. at 326.) Sgt. Charles never testified at trial. However, Officer Ruiz testified that after returning to the stationhouse, he witnessed Sgt. Charles hand Officer Urbina the vial. (*See* Trial Tr. at 326.) Officer Urbina did attest to possessing the vial in the stationhouse, but could not specify from whom he had received it. (*See* Trial Tr. at 238.)

A Police Department chemist testified that he received a red-topped vial in a sealed evidence envelope marked by Officer Urbina. (*See* Trial Tr. at 303.) The chemist also testified that the vial contained cocaine. (*See* Trial Tr. at 305.)

### C. Patterson's Arrest

Officer Urbina kept Patterson under surveillance from the time he first appeared on the corner of Lenox Avenue and 128th Street until the time of his arrest. (*See* Trial Tr. at 226–27.) Officer Urbina testified that Patterson was wearing a black t-shirt that featured the distinct slogan of a popular urban music group, black nylon pants, a black baseball hat emblazoned with the word "Crooklyn," and in-line skates. (*See* Trial Tr. at 228.) Officer Urbina relayed this description to the field team as well. (*See* Trial Tr. at 232–233, 328.) Officer Ruiz later apprehended Patterson on 128th Street. (*See* Trial Tr. at 324, 329.)

Patterson's friend, Mark Goodwin, was also dressed in black and wearing in-line skates, but his t-shirt was plain and his pants were cotton. (*See* Trial Tr. at 436–38, 447.) Goodwin testified that he did not see Patterson make any drug sale at 2:15 p.m., the time Officer Urbina alleged witnessing the Patterson–Ray exchange. (*See* Trial Tr. at 439.) Goodwin later admitted that he was not wearing a watch on August 9 and could not accurately gauge at what times he was with Patterson. (*See* Trial Tr. at 451.)

### D. The Proceedings Below

On December 5th, 1994, a jury found Patterson guilty of the criminal sale of a controlled substance. (*See* Trial Tr. at 532.) The trial judge later sentenced Patterson to a term of imprisonment of five to ten years. (*See* Sentence Tr. at 5.) Patterson subsequently appealed to the Appellate Division, First Department, where he unsuccessfully argued that there had been no rational basis for the jury's finding of guilt because a fatal flaw existed in the chain of custody of the cocaine-filled vial. *See People v. Patterson*, 252 A.D.2d 351, 351, 675 N.Y.S.2d 533 (1st Dep't 1998); Petition Ex. B, Def's Appellate Br., at 8–12. The New York Court of Appeals denied Patterson leave to appeal. *See People v. Patterson*, 92 N.Y.2d 903, 903, 680 N.Y.S.2d 67, 702 N.E.2d 852 (1998). Patterson now seeks a writ of habeas corpus from this Court.

## II. Discussion

### A. Preliminary Matters

■ A petition for a writ of habeas corpus must (a) be based on a violation of federal law, *see* 28 U.S.C.A. § 2254(a) (West Supp.1999), and (b) assert a claim that has been "fairly presented" to the state courts, *see Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir.1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)).

#### 1. Federal Nature of the Claim

■ A petitioner must have cited specific constitutional provisions or relied on federal constitutional precedents in his case before the state court. *See id.* at 413–14. Here, Patterson's brief to the Appellate Division cited to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Court in *Jackson* held that a defendant's due process rights are violated when, viewing the trial evidence in a light most favorable to the prosecution, no rational juror could have found him guilty. *See* U.S. Const. amend.

XIV; *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. Thus, Patterson properly apprised the state court of the federal nature of his claim by citing to *Jackson*, a constitutional precedent. *See Wright v. West*, 505 U.S. 277, 309, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (Kennedy, J., concurring) (including *Jackson* among examples of Supreme Court rules that form the legal basis of habeas petitions).

#### 2. Exhaustion

■ Habeas petitioners must exhaust all available state remedies before filing a claim with a federal district court. *See* 28 U.S.C.A. § 2254(b)(1)(A) (West Supp. 1999). This procedural prerequisite to federal habeas jurisdiction is rooted in principles of federalism, comity, and judicial economy, allowing state courts the initial opportunity to correct instances of constitutional error. *See Murray v. Carrier*, 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Under the exhaustion doctrine, a petitioner must "fairly present[ ]" his claim to the state court before a federal court can review his case. *See Jones*, 126 F.3d at 413. A petitioner successfully fulfills the exhaustion requirement by raising his claim in the highest state court. *See Tyson v. Keane*, 159 F.3d 732, 735 (2d Cir.1998), *cert. granted, Tyson v. Greiner*, —— U.S. ——, 119 S.Ct. 1270, 143 L.Ed.2d 365 (1999).

■ Patterson fairly presented his federal due process argument in the New York State courts because his brief to the Appellate Division thoroughly discussed the pertinent facts and law connected to this issue. The Appellate Division held that the evidence sufficed to support the jury's finding. Patterson appealed this decision. Though the New York Court of Appeals denied him leave to appeal, *see People v. Patterson*, 92 N.Y.2d 903, 92 N.Y.2d 903, 903, 702 N.E.2d 852 (1998), his claim reached the highest state court for purposes of the exhaustion doctrine, *see Williams v. Smith*, 591 F.2d 169, 171 (2d Cir.1979); *Ramirez v. Headley*, 98 Civ.

2603(RWS), 1998 WL 788782, at *4 (S.D.N.Y. Nov. 10, 1998). Accordingly, Patterson has exhausted his available state remedies.

### B. *Analysis*

Having considered the preliminary matters, we now turn to the merits of Patterson's claim. The crux of Patterson's claim is that the evidence at trial was insufficient to support his conviction. The Supreme Court devised the standard for determining the sufficiency of evidence in *Jackson* as follows: "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. Thus, under *Jackson*, the petitioner bears "a very heavy burden." *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.1983) (quoting *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.1982)); *accord Fernandez v. Dufrain*, 11 F.Supp.2d 407, 416 (S.D.N.Y.1998).

Before Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas courts reviewed *Jackson* claims by inquiring into the elements of the underlying offense. *See Einaugler v. Supreme Court*, 109 F.3d 836, 839 (2d Cir.1997). Here, the New York Supreme Court convicted Patterson for the criminal sale of a controlled substance. Section 220.39 of the New York Penal Law provides as follows: "A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells a narcotic drug." N.Y.Penal Law § 220.39 (McKinney 1999) (internal punctuation and subsection numbering omitted). Section 220.39 requires proof of three elements: (1) a knowing actor (2) who sells (3) a narcotic drug.

Patterson claims that the evidence did not sufficiently prove that the Police Department took its positive sample of cocaine—a "narcotic drug"—from the red-topped vial Officer Ruiz seized from Ray.

Specifically, he argues that the prosecution did not establish an unbroken chain of custody for the vial. (*See* Pet's Traverse, at 2–3; Pet'n Ex. B, Br. for Def.-Appellant, at 8–13.) Patterson suggests that Sgt. Charles may have intermingled several vials in his possession, one of which Urbina received at the stationhouse. (*See* Pet'n Ex. B, Br. for Def.-Appellant, at 12.) He argues that this possibility sheds enough doubt to require a grant of his petition. (*See id.*)

Patterson further contends that the prosecution failed to establish a chain of custody for the vial because (1) Sgt. Charles never testified, (*see id.* at 11), and (2) Officer Urbina did not know from whom he received it, (*see* Trial Tr. at 238). Patterson contends that because the custodial link between Officers Ruiz and Urbina is unclear, there is reasonable doubt that the vial the officers removed from Ray was the same cocaine-filled vial introduced at trial. (*See* Pet'n Ex. B, Br. for Def.-Appellant, at 10–13.)

The parties disagreed in the state court proceedings and still disagree about the correct state procedural standard for weighing evidence regarding the establishment of a chain of custody. *See People v. Patterson*, 252 A.D.2d 351, 351, 675 N.Y.S.2d 533 (1st Dep't 1998); Pet's Traverse, at 1–2; Resp's Mem. in Opp'n, at 8–9. The New York Court of Appeals provided the following standard for deciding chain of custody disputes: "[W]hen the evidence itself is not patently identifiable or is capable of being replaced or altered, admissibility generally requires that all those who have handled the item 'identify it and testify to its custody and unchanged condition'." *People v. Connelly*, 35 N.Y.2d 171, 174, 359 N.Y.S.2d 266, 316 N.E.2d 706 (1974) (quoting *People v. Sansalone*, 208 Misc. 491, 493, 146 N.Y.S.2d 359 (Westchester County Ct.1955)). New York courts will also forgive custodial gaps "where the circumstances provide reasonable assurances of the identity and unchanged condition" of the evidence. *Ama-*

*ro v. City of New York,* 40 N.Y.2d 30, 35, 386 N.Y.S.2d 19, 351 N.E.2d 665 (1976); *accord People v. Julian,* 41 N.Y.2d 340, 343, 392 N.Y.S.2d 610, 360 N.E.2d 1310 (1977). Patterson contends that the prosecution did not establish an unbroken chain of custody under either standard. (*See* Pet's Traverse, at 1–2; Pet'n Ex. B, Br. for Def.–Appellant, at 8–13.) The respondent claims the prosecution's evidence was sufficient to support Patterson's guilt, despite the absence of Sgt. Charles' testimony. (*See* Resp's Mem. in Opp'n, at 9–10.) The Appellate Division agreed with the respondent on this issue and decided that the prosecution had satisfied the *Amaro* standard. *See Patterson,* 252 A.D.2d at 351, 675 N.Y.S.2d 533 ("These circumstances provide reasonable assurances of the identity and unchanged condition of the evidence." (citing *People v. Julian,* 41 N.Y.2d 340, 392 N.Y.S.2d 610, 360 N.E.2d 1310 (1977))).

█ The dispute over whether the prosecution established a chain of custody was a question for the jury to resolve. *See People v. Butler,* 132 A.D.2d 771, 773, 517 N.Y.S.2d 580 (3d Dep't 1987). Juries are permitted to "draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

█ Viewing the evidence in the light most favorable to the prosecution, a rational juror could certainly have found Patterson guilty beyond a reasonable doubt because the unchanged condition and identity of the vial was reasonably assured by the evidence. First, a rational juror may have found the vial's condition unchanged as it passed from officer to officer on the strength of Officer Ruiz's testimony—he clearly saw Sgt. Charles hand the vial to Officer Urbina. *See Patterson,* 252 A.D.2d at 351, 675 N.Y.S.2d 533 ("The People's failure to call one of the officers who handled the drugs after defendant's arrest did not create a fatal gap in the chain of custody where another officer testified that he saw the absent witness give the vial in question to the vouchering officer[,

*i.e.,* Officer Urbina].". Second, Officer Ruiz and the Police Department chemist—the first and last individuals who possessed the vial—both identified it by referring to its red top. (*See* Trial Tr. at 305, 326.)

Finally, in enacting AEDPA, Congress further limited this Court's role in determining the sufficiency of the evidence adduced at trial. The statute, codified in part at 28 U.S.C. § 2254(d), provides:

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudications of the claim—(1) resulted in a decision that was *contrary to,* or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C.A. § 2254(d)(1) (West Supp.1999) (emphasis added).

Although the Second Circuit has not yet provided clear guidance regarding how courts within this Circuit should apply § 2254(d)(1), other appellate courts have devised three distinct approaches. The Seventh Circuit offered the first in *Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996) (*en banc*), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), which the Fifth and Eleventh Circuits have adopted, *see Neelley v. Nagle,* 138 F.3d 917, 924 (11th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999), *Drinkard v. Johnson,* 97 F.3d 751, 767–68 (5th Cir.1996). In *Green v. French,* 143 F.3d 865, 870 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999), the Fourth Circuit devised a second interpretation. The First Circuit has taken an alternative approach, *see O'Brien v. Dubois,* 145 F.3d 16, 24 (1st Cir.1998), which the Third Circuit has since adopted with modification, *see Matteo v. Superintendent,* 171 F.3d 877, 891 (3d Cir.1999) (*en banc*),

*petition for cert. filed,* 68 U.S.L.W. 3008 (U.S. June 22, 1999) (No. 98–2050).

At least thirteen district courts in the Second Circuit have cited to cases aligned with the *Lindh* approach. *See Glover v. Portuondo,* 96 Civ. 7616(JGK), 1999 WL 349936 (S.D.N.Y. May 28, 1999); *Millan v. Keane,* 97 Civ. 3874(JGK), 1999 WL 178790 (S.D.N.Y. Mar. 31, 1999); *Montalvo v. Portuondo,* 97 Civ. 3336(RWS), 1998 WL 851589 (S.D.N.Y. Dec. 9, 1998); *Natal v. Bennett,* 98 Civ. 1872(RWS), 1998 WL 841480 (S.D.N.Y. Dec. 3, 1998); *Carromero v. Strack,* 98 Civ. 3519(LAP), 1998 WL 849321 (S.D.N.Y. Nov. 19, 1998); *Rodriguez v. Bennett,* 98 Civ. 580(LBS), 1998 WL 765180 (S.D.N.Y. Nov. 2, 1998); *Redd v. Quinones,* 98 Civ. 2604(LBS), 1998 WL 702334 (S.D.N.Y. Oct. 7, 1998); *Fernandez v. Dufrain,* 11 F.Supp.2d 407 (S.D.N.Y. 1998); *Morgan v. Bennett,* 96 Civ. 4106(ERK), 1998 WL 315135 (E.D.N.Y. May 27, 1998); *Ramirez v. Senkowski,* 7 F.Supp.2d 180 (E.D.N.Y.1998); *Smalls v. Batista,* 6 F.Supp.2d 211 (S.D.N.Y.1998); *Smith v. Sullivan,* 1 F.Supp.2d 206 (W.D.N.Y.1998); *Mobley v. Stinson,* 94 Civ. 5911(HB), 1997 WL 80587 (S.D.N.Y. Feb. 26, 1997). On the other hand, three district court decisions, including a recent Southern District decision, have followed the *O'Brien–Matteo* approach. *See Lurie v. Wittner,* 98 Civ. 7697(SAS), 1999 WL 459940 (S.D.N.Y. July 2, 1999) (following *Matteo* ); *Chance v. Kupec,* 96 Civ. 2204(AHN), 1998 WL 846740 (D.Conn. Nov. 18, 1998) (following *O'Brien* ); *Bragdon v. Warden,* 96 Civ. 1840(AHN), 1998 WL 846738 (D.Conn. Nov. 18, 1998) (same). A further discussion of the *Lindh* and *O'Brien–Matteo* approaches follows.[1]

### 1. The Lindh *approach*

■ The Seventh Circuit in *Lindh* devised a standard that, following pre-AEDPA habeas law, divides the petitioner's challenge into questions of law, questions of fact, and mixed questions of law and

fact. *See Drinkard,* 97 F.3d at 767–68. Questions of law are analyzed *de novo* under the "contrary to" clause, while questions of fact and mixed questions are analyzed under the "unreasonable application" clause with deference to state court determinations. *See Drinkard,* 97 F.3d at 768–69. Because applying *Jackson* involves a mixed question, *see Wright v. West,* 505 U.S. 277, 309, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (Kennedy, J., concurring), we would analyze this case under the "unreasonable application" clause. Under the "unreasonable application" standard, "an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect." *Drinkard,* 97 F.3d at 769.

### 2. The O'Brien– Matteo *approach*

The First Circuit in *O'Brien* devised a two-step analysis. *See O'Brien,* 145 F.3d at 23. The *O'Brien* approach provides:

First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent.... [F]or the writ to issue [under the "unreasonable application" clause], the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.

*Id.* at 24–25 (citations omitted). The Third Circuit in *Matteo* adopted *O'Brien*'s treat-

---

1. No court in this circuit, and no appellate court aside from the Fourth Circuit, has yet endorsed the *Green* approach. Because *Green* is not widely followed, we discuss it only briefly *infra.*

 

ment of the "contrary to" clause, but modified the standard for those cases falling under the "unreasonable application" prong. *See Matteo*, 171 F.3d at 891 (stating its modified standard as follows: "[T]he habeas court must ask ... whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified."). However, the *Matteo* modification does not apply in this case because *Jackson*, as a "governing rule" prescribed by the Supreme Court, requires analyzing this case under the "contrary to" prong of the *O'Brien* approach. *See O'Brien*, 145 F.3d at 25 & n. 6 (citing *Jackson* as an example of a well-established Supreme Court rule which "shape[s] the contours of an appropriate analysis of a claim of constitutional error to merit review of a state court's decision under section 2254(d)(1)'s 'contrary to' prong").[2]

### 3. Application

This case does not present a viable claim under the traditional pre-AEDPA analysis because rational jurors could find the elements of Patterson's offense beyond a reasonable doubt. Given that the AEDPA narrows this Court's review and requires us to give even more deference to the result reached in the state court proceedings—regardless of which circuit's approach to § 2254(d)(1) we utilize—it is clear that Patterson's application fails. Had we decided this case under *Lindh*, we believe reasonable jurists would not be of one view that the state court incorrectly applied *Jackson*. On the other hand, had we applied the *O'Brien–Matteo* approach, we would have found that the state court decision was not contrary to *Jackson*. Because Patterson's petition fails under both

competing standards, we do not at this time see a reason to choose between them.

### III. Conclusion

For the foregoing reasons, Patterson's petition for a writ of habeas corpus is denied. The petitioner has not made a substantial showing of the denial of a constitutional right, and therefore a certificate of appealability will not issue. *See* 28 U.S.C.A. § 2253(c)(2) (West Supp.1999). In addition, leave to appeal *in forma pauperis* is denied, as it appears that any appeal would not be taken in good faith.

SO ORDERED.

---

**2.** In contrast to the *Lindh* and *O'Brien–Matteo* approaches, the Fourth Circuit deems a state court decision "contrary to" the governing Supreme Court precedent when, "through ... the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a ... result opposite to and irreconcilable with that reached in the

precedent." *Green*, 143 F.3d at 870. This standard has been criticized on the ground that it seems to reserve few cases for "contrary to" analysis, and therefore renders that portion of the statute superfluous. *See* 2 James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice & Procedure § 30.2c, at 1253 (3d ed.1998).